---

### J. M. SHOCK ABSORBER CO. et al. v. BLACKLEDGE.

(Circuit Court of Appeals, Seventh Circuit. January 5, 1915.)

#### No. 2140.

PATENTS ☞328—INFRINGEMENT—SHOCK ABSORBER.

The Tilt patent, No. 988,229, for an auxiliary automobile side spring or shock absorber, is not a generic patent, so as to be entitled to a broad range of equivalents, but in view of the prior art is limited to the specific device shown and described in the specification and drawings. As so construed, *held* not infringed by the device of the Jacquet patent, No. 1,015,682.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois; Arthur L. Sanborn, Judge.

Suit in equity by John W. Blackledge against the J. M. Shock Absorber Company and others. Decree for complainant, and defendants appeal. Reversed.

For opinion below, see 213 Fed. 478.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Drury W. Cooper, of New York City, for appellants.

George L. Wilkinson, of Chicago, Ill., for appellee.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

KOHLSAAT, Circuit Judge. Appellee filed his bill in the District Court to restrain infringement of patent No. 988,229, granted to C. A. Tilt on March 28, 1911, for a vehicle side spring, and particularly for an auxiliary automobile spring or shock absorber. Thereafter such proceedings were had that appellant was adjudged to have infringed claim 1 of said patent, which reads as follows:

"The combination with the two members of a vehicle elliptical spring, of two pairs of vertical guides, means for securing the end of the lower member of the spring between the pairs of guides, two pairs of sleeves surrounding said guides, means for pivotally supporting the end of the upper member of the spring between and directly by the pairs of sleeves, a plate secured to the lower ends of said guides, and coiled springs surrounding said guides and supported intermediate of said plate and said sleeves."

This cause is now before us on appeal from that judgment.

The device of the patent consists in a supplemental spring for use "at the point of connection of the members of the elliptical spring with each other," which shall be so arranged with reference to their supports, as to serve as a connecting link between, and prevent lateral movement of, the upper and lower members of the elliptical spring, without interfering with the relative vertical movements of the springs. Fig. 2 of the patent drawings is here reproduced:

Fig. 2

"The operation of my improvements," says the patentee at line 8, p. 2, and down to and including line 25, "is substantially as follows: The weight of the body of the automobile and the load which it carries is transmitted through the elliptic side spring 6 to the lower sliding blocks 12, 12a. The side spring 6 being pivotally attached to these blocks by means of a bolt 10, the said weight is transmitted, as above described, in any of the various angular positions which the parts may assume. The said weight is then transmitted to the spiral springs 13, and they in turn transmit the weight to the plate 15, which in turn transmits said weight to the heads of the bolts 17. The bolts 17 carry the weight to the blocks 18 and 18a, which finally give it to the bolt or pin 19 at the end of the lower elliptic side spring 7."

From the above cut it will be seen, as stated in the specification, that:

"The upper elliptic side spring 6 is pivotally attached at the extreme end of its downwardly curved portion to the bolt or pin 10 by means of the eye or loop 11 in the end of said spring. The bolt 10 is carried by two vertically sliding blocks 12 and 12a, one at each end of said bolt. The looped end 11 of the spring 6 lies between the sliding blocks 12 and 12a. * * * The blocks 12 and 12a rest upon spiral compression springs 13. * * * The

lower ends of the springs *13* rest upon a plate *15*, and said plate is carried by the heads *16* of bolts *17*. The plate *15*, therefore, holds four of the bolts *17* in their proper relative positions. * * * The bolts *17* extend upwardly through the springs *13* and are slidably fitted within the ends *12b* and *12c* of the blocks *12* and *12a*. * * * The said bolts *17* are threaded into other blocks *18* and *18a*, which are similar to the blocks *12* and *12a*. The only difference between the blocks *12*, *12a* and the blocks *18*, *18a* is that the former are loosely fitted upon the bolts *17* while the latter are threaded thereto. It will therefore be seen that the blocks *12*, *12a*, are free to slide longitudinally of the bolts, while the blocks *18* are fixed upon the ends of said bolts. The blocks *18*, *18a*, are also held in position by a bolt *19*, and said bolt *19* passes through an eye or loop *20* in the extreme end of the lower side spring *7*. The lower side spring *7* is pivotally attached to the bolt *19*, and hence to the upper pair of blocks *18*, *18a*."

The patent also provides smaller springs *24*, one around each of the bolts *17* situated between the sliding blocks *12*, *12a* and the blocks *18*, *18a*. These, it is claimed, serve to receive and cushion the sudden upward movements of the lower blocks *12*, *12a*, and of the vehicle body connected thereto, through the spring *6*. The sliding engagement of the bolts *17* with the blocks *12*, *12a*, it is claimed, constrain both sets of blocks, *12*, *12a*, and *18*, *18a*, to move in alignment, thereby preventing relative lateral movement of the ends of the two elliptical spring members. Appellee is the assignee of the patent.

Appellants' alleged infringing device is that of the Jacquet patent No. 1,015,682, granted January 23, 1912, for a so-called shock absorber for use in motor cars and other vehicles, upon an application filed subsequently to that of the patent in suit. Figs. 1 and 2 of the drawings are as follows, viz.:

"My elastic spring support, or shock absorber," says the patentee (page 1, line 50), "comprises a plurality of cylinders or boxes *1*, each provided with a closed head *4*, through which passes the bolt or pin *8* of the hanger member *2* supported from the body of the car. Inclosed in said boxes or cases *1*, are springs *3* preferably helical in form, and supporting each spring is a U-shaped rod *5*, screw-threaded at its ends *12*, and provided with the nuts *9*, adapted to support a disk *13* upon which the lower ends of said springs *3* rest. The upper or loop portion of said rods *5* pass over the bolt *6* of the flat vehicle spring *7*, while the bolt *8* is straddled by said rods and a space *16* is provided between the top of said head *4* and said bolt *6*. * * * It will be observed that the head *4* is provided with an upwardly extending portion to receive the bolt *8* and that the rods *5* pass through this extension as well as through the head proper, thereby being provided with long bearings capable of steadying the reciprocating movements of said rods, while the said casing is free to oscillate around both the bolts *6* and *8* owing to the space *16*."

This arrangement, the patentee asserts, will avoid lateral wear of the long bearings and cause the rods *5* to reciprocate smoothly. Reference to the Tilt patent discloses that the claim in suit does not call for a long bearing. This feature is covered by claims 2 and 3 not now in suit.

Application for these two patents were pending contemporaneously in the Patent Office from October 21, 1910, to March 28, 1911. This fact, appellants insist, raises a strong presumption that in the judgment of the examiner such differences existed between the two that interference proceedings would not lie. Tilt's original claim 3 was in substance the same as the claim in suit, save for the bottom plate *15*. It was rejected on the ground that it did not constitute patentable novelty to double the device of original claim 2, which had been rejected on Collins and Furmidge patents, and rejection acquiesced in. After adding the bottom plate *15* and making some minor changes in the claim, it was allowed and is the claim in suit. The patentee in his specification gives as the specific objects of the patent the providing of supplementary springs and the prevention of lateral movements between the upper and lower members of the elliptical springs relatively to each other without interfering with the relative vertical movements of the springs; that is, the device should be so arranged as to absorb the shock of road or other jolts and yet leave the ends of the elliptical springs in vertical alignment, or substantially so. The patent in suit takes as well the place of both a shackle and of a shock absorber. The alignment of the opening in the sleeve blocks *12, 12a,* with the threaded openings in blocks *18, 18a,* for the receiving and retention of rods *17,* in order that these rods may slide without friction, is essential to the practical use of the device.

Taking into consideration, then, the proceedings in the Patent Office with regard to the addition of the plate *15* into which the guiding rods *17* are rigidly placed, the four guide rods forming a parallelogram whose four corners are squarely and immovably held together at both their tops and bottoms, thereby securing alignment between the openings in sliding guide blocks or sleeves *12* and *12a* and the openings which receive and rigidly retain the upper ends of the rods *17,* together with the objects sought to be attained by the patent, there is presented a very persuasive argument for the proposition that the plate *15* is made an essential element of the claim in suit, and for the further claim that, in order to maintain the necessary rigidity, it is necessary that the guide rods *17* have substantially no vertical movement independent of and relatively to each other and to their top and bottom binding plates or blocks. Appellants' device lacks both of these elements. Whether or not it has the plain equivalent of the two pairs of guide rods depends upon the scope to be given to the claim in suit. The rods of the alleged infringing device consists of one rod on each side, but that one rod is bent into the shape of a hairpin with its two ends threaded and hanging down and passing through a disk *13,* where it is secured with nuts. There is no connection between either the lower plate or the ends of one hairpin-shaped rod with the other rod and disk, and no bracing effect exists between the two. That the curved portion of the hairpin-shaped rod is not rigidly placed seems clear. Whether or not the practical operation of the two is similar is not the test. The two ideas are different. The one takes note of and provides against any lateral movement. The other can claim such a function only as an incident, and then only loosely, since the two guide rods do not necessarily act in unison.

It will be seen that there is a difference between the means for securing alignment of the openings through which the guide rods slide and for support of the rods themselves. In the first place, the several supports of the upper ends are entirely dissimilar, as above stated. Secondly, in place of the sliding guide block *12* of Tilt, Jacquet's rod slides through an opening in the closed head *4* and its upwardly extending portion. Integral with the head *4*, and extending down to the ends of the hairpin-shaped rod or bolt, is the cylinder *1*, which encloses the ends of the doubled bolt *5* and the helical spring. Thus the bolt *5*, or the lower arms thereof, has not only the guide bearing or support of the head *4* and its said extension, but such lateral bracing effect as comes from the walls of the cylinder, which, while not closely hugging the spring or the bolt, yet serves to prevent any considerable lateral distortion and to relieve the strain upon the true bearing *4* and its extension. One of the advantages claimed for the Jacquet device is that it may depend from the vehicle body and is not limited to elliptical spring support. Of course, invention could not be predicated upon the mere addition of the cylinder enclosing the hairpin-shaped rod, in the absence of any special function thereof in connection with the rod and spring. It may well be that, in co-operation with the disk *13*, the bolts *9* and the head *4*, there is provided for the rod *5* a cushioning or pistoning result by reason of the fact that the cylindrical disk bears against the inner walls of the cylinder, thereby augmenting the efficiency of the device. The Jacquet patent presents other advantages, such as its adaptability to the substitution of springs of the same or greater tension and size.

It is claimed by appellee's counsel that Tilt's patent is so far generic as to entitle it to a large range of equivalents. After an examination of the condition of the art at the date of the application for the Tilt patent, we are of the opinion that such is not the case. The disclosures of the then existing art satisfactorily establish the fact that the idea, the concept, was well developed before Tilt, and that there was no room for a broad patent in the art.

Attention is called in the briefs to the fact that the claim makes no provision for disposition of that portion of the rod *17* located above the guide blocks *12, 12a*. It does, however, call for means for securing the ends of the lower member *7* of the side spring between the pairs of guides numbered *17*. This is shown in the specification and drawings to be accomplished by pivoting the end of said member *7* upon the cross-bolt *19*. The only support the cross-bolt is shown to have is the block *18*, unless it receives some support from the said member *7*. The block *18* is rigidly supported upon the bolts *17*. Such support, or the equivalent thereof, is essential to the operativeness of the device. We may therefore assume that the specification and drawings hould be read into said claim in suit.

Of the patents cited by the examiner, the Furmidge patent, No. 87,612, issued December 19, 1905, is for an auxiliary vehicle spring. It has two guide rods rigidly fastened at their top and bottom and surrounded by helical springs. It lacks entirely the sleeve supports shown in the patent in suit, but otherwise operates in substantially the same manner. It was found to be defective by reason of the lat-

eral distortion growing out of its want of lateral support. It will be noticed that it is supported from the body of the vehicle rather than the members of the elliptical spring.

Collins patent, No. 907,463, issued December 22, 1908, for an automobile auxiliary spring, likewise cited by the examiner, depends from the vehicle body. It discloses a pair of vertical guide rods, which are not surrounded by the helical spring, but which pass through upper plates, and the lugs provided thereon, which act as supporting sleeves and extend downward through a bottom plate. They are held rigidly at their upper and lower ends, and braced by the sleeves or lugs, and serve to keep the helical springs in position.

Emmerich patent, No. 849,109, for an auxiliary automobile spring, being one of the patents cited by the examiner, discloses guide rods surrounded by helical springs. It has also a third helical spring. The rear end of the lower leaf of the elliptical spring is connected with the yoke part by a bolt mounted on the upper end of a rod, which is inclosed by the third helical spring. This rod moves slidably through the bottom plate. The guide rods are enlarged at a point above the upper plate, against which enlargement the plate abuts. Such at least would seem to be the meaning of the term "fixed collars," though some of the experts assume that the collars are slidably attached to the rods and constitute extensions of the upper plate. This plate is of substantial thickness. These enlargements on the rods, which are termed collars by the patentee, seem to be integral with the guide rods. Their purpose is not stated in the specification but they serve to strengthen the guide rods and form a stop to the spiral springs. The upper plate is clearly a sleeve binding the two rods together and preventing distortion. This patent shows three points at which the guide rods are supported, namely, the bolt, the upper plate and the lower plate.

In Fig. 1 of the drawings of the patent to Young, No. 901,578, granted October 20, 1908, for a steadying device for supplementary vehicle springs, is shown a shock absorber which has two guide rods surrounded by springs—rigidly joined by a plate at their lower ends and a cross-bolt at their upper ends. The device is further strengthened by a rod located intermediate the two, having a U-shaped upper end, the two arms of which are fastened into the cross-bolt which is carried by the springs, while the lower end thereof slides through the bottom plate. The patentee refers to Emmerich, which latter patent the device closely resembles.

In Fig. 1 of the drawings of the Brooks English patent, No. 26,973, of June 21, 1906, for a shock absorber for motor and vehicle springs, there is disclosed a device having substantially the arrangement of spiral springs called for by the patent in suit, together with guide rods rigidly connected at their upper and lower ends, attached to a crossbar located substantially midway between the upper and lower ends of the guide rods and carrying three steel sleeves which, says the patentee, "form a large bearing surface on the rods and reduce side strains to a minimum."

The English patent to Marr for a device for suspending the bodies of vehicles through the use of levers and coiled springs, accepted

February 27, 1908, discloses boxed spring and rod devices, used, however, in somewhat different relations from those of the patent in suit.

The Pernot French patent, made public March, 1907, discloses a boxed guide rod surrounded by a spiral spring similar to that of appellants.

In the foregoing patents of the prior art, the elliptical springs are mounted between the guide rods as in the patent in suit.

Whatever Tilt is entitled to must be found in the device of his patent, specifically. His bottom plate and its four rigid rods, together with his specific arrangement of his sleeves and blocks, are essential elements of his claim. Appellants do not use those features, and therefore do not infringe.

The decree of the District Court is reversed, with direction to that court to dismiss the bill for want of equity.